# In the United States Court of Federal Claims

No. 12-8C
(Filed: February 11, 2014)

| | |
|---|---|
| G4S TECHNOLOGY LLC, | ) |
| | ) |
| Plaintiff, | ) Insolvent prime contractor; incidental or |
| | ) intended third-party beneficiary; |
| v. | ) subcontractor's right to obtain payment |
| | ) directly from the federal government; |
| THE UNITED STATES, | ) summary judgment |
| | ) |
| Defendant. | ) |
| | ) |

*Lewis S. Wiener*, Washington, DC, for plaintiff.

*David A. Levitt*, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant.

# **O P I N I O N**

**FIRESTONE**, Judge.

In this case, G4S Technology LLC ("G4S" or "plaintiff")[1] alleges that it was an intended third-party beneficiary of a 2009 Loan and Security Agreement ("Loan Agreement") between the United States Department of Agriculture's Rural Utilities Service ("RUS") and Open Range Communications, Inc. ("Open Range").[2] Under the

---

[1] G4S was known as "Adesta LLC" prior to its name change, effective February 23, 2011. For ease of reference, the court refers to the plaintiff as "G4S" throughout the opinion.

[2] Following limited discovery on whether plaintiff could demonstrate an implied-in-fact contract with the government or G4S's status as a third-party beneficiary, plaintiff abandoned its implied-in-fact contract theory. See Pl.'s Suppl. Resp. at 1 n.1.

Loan Agreement, RUS agreed to provide funds to Open Range that were to be used to construct a wireless broadband network in hundreds of rural communities under the Rural Development Broadband Loan and Loan Guarantee Program.  G4S, which was one of Open Range's vendors, alleges that RUS breached its promise to pay G4S for $10,321,340.11 worth of services that remained due to G4S after Open Range filed for bankruptcy in 2011.

Pending before the court is the defendant, the United States' ("the government") motion to dismiss plaintiff's complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  The government has moved, in the alternative, for judgment on the pleadings under RCFC 12(c) or for summary judgment under to RCFC 56.  The government contends that G4S cannot establish that it was a third-party beneficiary to the Loan Agreement between Open Range and RUS.  Although G4S has not cross-moved for summary judgment, plaintiff contends that it has alleged sufficient facts—and that the undisputed evidence establishes—that G4S was an intended third-party beneficiary of the Loan Agreement.

For the reasons discussed below, the court finds that it has jurisdiction to consider the plaintiff's claim, and that the government is entitled to summary judgment.

## I.   STATEMENT OF FACTS[3]

### a.  The 2009 Loan Agreement

On January 9, 2009, Open Range and RUS entered into a Loan Agreement by which RUS agreed to make a $267,298,000 loan to Open Range to finance construction of wireless broadband in 540 RUS-approved markets.  <u>See</u> Pl.'s Suppl. Resp. at 4.  The Loan Agreement established two conditions required for closure.  First, One Equity Partners III, L.P. ("OEP"), a private equity firm with an interest in Open Range, was required to deposit $97 million into Open Range's deposit account.  <u>See</u> Pl.'s Suppl. Resp. App. at A222.  This amount was to be used for operating expenses and construction of broadband networks outside of the RUS-approved markets ("Non-RUS Markets").  <u>See</u> <u>id.</u>; 2d. Am. Compl. Ex. A at 7; 7 C.F.R. § 1738.20 (2009) (listing eligibility requirements for loan applicants).  Second, Open Range was required to furnish to RUS a six-month plan that described the construction to be performed by tower site, estimated cost of construction, commencement and completion time frames, and the workforce that would be carrying out the construction.  <u>See</u> Pl.'s Suppl. Resp. App. at A199.  Open Range later submitted a six-month plan made clear that third-party vendors would be used to complete portions of the construction work.  <u>Id.</u> at A469.

### b.  Funding procedures under the Loan Agreement

The Loan Agreement required Open Range to establish a pledged deposit account into which RUS would deposit loan funds.  <u>Id.</u> at A202-03.  Funds in the pledged deposit

---

[3] Unless otherwise noted, the facts presented herein are not disputed and are derived from the complaint and the parties' briefs or the exhibits thereto.

account were to be used solely for the purposes for which RUS advanced the funds.  Id.
at A203.  Further, disbursements from the account were required to be made in
accordance with RUS Bulletin 1738-2 ("the Bulletin").[4]  Id.  In addition, Article VII of
the Loan Agreement established certain "Lender's Rights" related to RUS's obligation to
fund loan advances.  Specifically, Section 7.1(b) stated that "RUS, in its sole discretion,
may terminate the offer to make the Loan(s) and/or obligation to make Advances
hereunder, under the circumstances specified in Schedule 1."  Id. at A212.  The
circumstances listed in Schedule 1 included, inter alia, Open Range's loss (or anticipated
loss) of access to the spectrum necessary to operate the planned wireless broadband
network.  Id. at A224.

    For advances to be used for engineering services (such as those provided by G4S),
the Bulletin generally required that Open Range and the vendor forward a RUS Form 245
to RUS for approval.  Id. at A238.  If approved, RUS was to send one copy of the
approval to Open Range and one copy to the vendor.  Id.  The Bulletin also established
procedures for small-scale construction contracts.  When an outside contractor was used,
the Bulletin required that either a RUS Contract Form 773 or other appropriate RUS
contract be used.  Open Range, as the borrower, was required to finance small-scale
construction projects (i.e., those of amounts not exceeding $500,000), and obtain

---

[4] RUS Bulletin 1738-2 is the Rural Broadband Access Loan and Loan Guarantee Advance and
Construction Procedures Guide.  Among other things, the guide establishes "requirements and
procedures to be followed by the borrowers in obtaining advances and making disbursements of
Loan funds."  Pl.'s Suppl. Resp. App. at A231.

reimbursement with loan funds once construction was completed.  Id. at A239.[5]  It is

undisputed that there was no provision in the Loan Agreement to provide direct payment

from RUS to the third-party vendors hired by Open Range.

### c.  Master Services Agreement

Open Range's relationships with the third-party vendors such as G4S, which it

hired to help carry out its obligations under the Loan Agreement, were each governed by

a Master Service Agreement ("MSA").  The MSA established a variety of requirements

on third-party vendors and Open Range, including the markets and committed dates,

technical specifications, general scope of work, and pricing.  See Compl. Ex. C at 13.

Plaintiff has provided evidence that Open Range submitted for RUS's review, comment,

and approval, a template of the MSA that it used for most of its vendors.[6]  See Pl.'s

Suppl. Resp. App. at A356-60 (e-mail message from Open Range seeking RUS feedback

on MSA and vendor selection process).

The MSA that G4S and Open Range executed contained provisions related to the

work ordering process.  Specifically, the MSA required that work being performed in

RUS-approved markets be conducted pursuant to an approved six-month plan and the

terms of RUS Forms 245 or 773.  See Compl. Ex. C. at 3.  For RUS-approved markets,

_____

[5] Ultimately, RUS and Open Range did not consistently comply with the Loan Agreement's
requirement that Open Range seek reimbursement after financing the small-scale construction
projects.  As explained, infra, Open Range and vendors agreed that vendors would not be paid
until 30 days after Open Range received loan advances from RUS.

[6] The government disputes that RUS "approved" the MSA used by G4S.  See Def.'s Suppl.
Mem. at 3 ("discovery demonstrated that RUS did not know of its existence, and never had a
copy, and hence could not have approved of payment arrangements between G4S and Open
Range reflected in the MSA.").

invoicing and payment was to be in accordance with RUS regulations, however the MSA

included a provision that Open Range "shall not be required to remit amounts to

[vendors] until thirty (30) days following receipt of such funds by [Open Range] and

from RUS."[7] See Compl. Ex. C. at 5.

Invoicing and payment in Non-RUS Markets was to follow a different procedure

than for RUS-approved markets. Specifically, the MSA required that Open Range

provide a purchase order to authorize work. Id. at 5. The MSA with G4S further

required G4S to provide an invoice in accordance with the purchase order, with a

payment due date of 45 days after Open Range's receipt of the invoice. Notably, the

MSA included a provision stating, "RUS is not liable for payment on any PO."[8] Id. at 6;

see Pl.'s Suppl. Resp. App. at A31.

### d. Vendor concerns following suspension of RUS advances to Open Range

Open Range began to experience cash-flow difficulties following the June 2, 2010

suspension of RUS loan advances to Open Range. The suspension was due to the Federal

Communications Commission's ("FCC") decision to suspend the spectrum permit of

Globalstar—the company through which Open Range had been licensing the spectrum

rights necessary to operate its network. As noted above, Open Range's loss of spectrum

entitled RUS to cease making advances on the loan. On July 14, 2010, RUS provided

---

[7] This provision in the MSA is apparently in conflict with RUS Bulletin 1738-2 because the Bulletin required borrowers to seek reimbursement from RUS after having first funded its subcontractors through operating funds.

[8] Plaintiff has provided evidence that the purpose of this provision was to ensure that RUS was not forced to advance loan funds for work that was outside the scope of RUS's rural broadband program.

Open Range with notice of its intent to terminate any remaining, unadvanced funds on the loan if Open Range failed to obtain an alternate agreement to gain access to spectrum rights.  See Def.'s Suppl. Mem. App. at A208.

By September 15, 2010 (if not earlier), Jonathan Adelstein, the Administrator of the RUS, received an e-mail indicating that Open Range's vendors were seeking immediate payment of past-due bills from Open Range.  See Pl.'s Suppl. Resp. App. at A317.  On September 22, 2010, the FCC issued a temporary permit to Open Range that allowed Open Range access to spectrum until January 31, 2011.  See Def.'s. Suppl. Mem. App. at A206-07.  This permit, however, only covered 264 "Approved Communities." Id.  As such, the maximum number of communities that Open Range could serve under the Loan Agreement was reduced from the original 540 markets to 264 markets.  Id.

Having secured access to at least some spectrum, an Open Range Executive Vice President contacted a Special Assistant to the Secretary of the United States Department of Agriculture on September 23, 2010, to ask when Open Range's funding requests would be fulfilled.  Pl.'s Suppl. Resp. App. at A396.  The record contains evidence that Open Range informed RUS that Open Range's vendors were concerned about being paid and that Open Range was worried that these vendors might leave the project.  Id.  The Special Assistant responded by stating that Open Range could "expect the letter and simultaneous release of funds by the end of the day."  Id. at A395.  With regard to the vendors, the Special Assistant stated that "I think at this point our team feels the letter will serve as the press release and we will continue to talk to anyone (vendors, press, etc)

who we need to [in order to] help calm fears and rebuild credibility.  Jonathan [Adelstein] can talk to whomever you'd like in this regard."  Id.

In a letter dated that same day, RUS modified its July14, 2010 letter.  Specifically, RUS withdrew its 90-day notice of intent to terminate the Loan Agreement, but left the suspension of funds in place with respect to certain communities that no longer had access to spectrum (i.e., those outside of the 264 "approved communities").  See Def.'s Suppl. Mem. App. at A206-08.  RUS authorized the immediate release of $14 million (for work done in June and July), and a future release of $5 million (for work done in July and August) upon receipt of a request from Open Range.  See id.; Pl.'s Suppl. Resp. App. at A392.  RUS stated that it would only consider advance requests for approved communities, and that no funds would be provided for conversion from Globalstar spectrum to any alternative.  See Def.'s Suppl. Mem. App. at A206-08.

On October 4, 2010, the Mr. Adelstein was copied on an email sent by Open Range to the Director of the RUS Broadband Division, Ken Kuchno, which stated that Open Range

> has a number of vendors requesting that [Open Range] give them assurances that RUS funding has been re-opened and it not [sic] currently curtailed.  They are most concerned due to the information in the press that indicates that advances were suspended on July 14 and there has been no public notice that this has been modified.  These vendors include [G4S] . . . . They have asked to see written confirmation that RUS is continuing to fund on a [sic] on-going basis.

Pl.'s Suppl. Resp. App. at A393.

On October 8, 2010, Mr. Adelstein sent a letter to Open Range approving a revised business plan that would provide support to the 264 communities covered by the

FCC's temporary permit.  The letter stated that RUS "is modifying the funding restrictions . . . to include any construction identified in the Build-Out Plan approved on October 8, 2010, for the period of July 1, 2010, to December 31, 2010."  Pl.'s Suppl. Resp. App. at A398.  On that same day, Mr. Kuchno also sent a letter to Open Range, which stated that RUS was "approving the Build-Out Plan for the period of July 1, 2010 to December 31, 2010, that covers the deployment of 228 markets, of which 212 will be funded with RUS funds and the remaining 16 with non RUS funds."  Pl.'s Suppl. Resp. App. at A399.

### e.  Subsequent requests for funds to pay continuing vendor arrearages

Notwithstanding the October 8 letters, RUS continued to withhold funding advances to Open Range through at least March 2011.  See Def.'s Suppl. Mem. App. A94-99.  According to Mr. Kuchno, the decision to suspend advances was approved by Mr. Adelstein.  Id.

On January 11, 2011, Open Range e-mailed Mr. Kuchno (and copied Mr. Adelstein) seeking approval of two contracts: one held by another vendor, Alvarion, and the other held by G4S.  Open Range requested that the G4S contract, which RUS had allegedly rejected on December 2, 2010, be approved (i.e., funded) because (1) RUS had provided verbal approval before the end of the year; (2) the funding for the specified markets had already been approved under the July through December 2010 six-month plan; and (3) the contracts had purportedly been "circulating through RUS for several months."  See Pl.'s Suppl. Resp. App. at A321.  The next day, Mr. Adelstein wrote to Mr. Kuchno about setting up a meeting to respond to Open Range.  See Pl.'s Suppl. Resp.

App. at A319 ("Why wait until Wednesday? They seem to be concerned about getting

paid now.  I get there are issues, but can't we get to the bottom of it sooner?").

On March 11, 2011, Open Range sent a Weekly Status Report to RUS that

indicated, among other things, that Open Range's arrearages to its vendors represented a

risk to deploying the broadband network.  Included in the status report was a list of

monies owed to Open Range in order to pay vendor contracts.  With regard to G4S, the

report listed as follows:

> [G4S]: [$]2,600,000 [G4S] Contract C-9 - $200k needs to be drawn down
> from the current contract.  However, the contract needs to be amended to
> increase the value by approximately $250K to cover site acquisition pass
> through expenses.  However, there may be more required on this contract
> once site acquisition is completed for various sites on this contract.

Pl.'s Suppl. Resp. App. at A170.

### f.  April 29, 2011 Loan Amendment, Equity Commitment Letter, and Shareholder Agreement

On April 29, 2011, RUS and Open Range executed an amendment to the Loan

Agreement ("Loan Amendment") in which they agreed to reduce the loan amount from

$269,298,000 to $180,000,000 to reflect a network size of only 160 markets, rather than

the original 540 markets.  As a condition precedent to advancing additional funds, the

Loan Amendment required receipt of a letter from OEP to Open Range in which OEP

committed to provide up to an additional $40,000,000 of equity capital.  See Compl. Ex.

B at 9.

Also on April 29, 2011, Open Range Holding Company (the shareholder of Open

Range) and OEP executed an "Equity Commitment Letter."  This letter obligated OEP to

provide up to $40,000,000 in additional capital to Open Range Holding, which would be used to fund Open Range's operating expenses.  The Equity Commitment Letter was conditioned, however, on RUS's agreement to fund certain advances listed in attached Schedules B-1 and B-2.  Schedule B-1 listed multiple contracts with outstanding amounts owed to G4S totaling $2,772,536.  See Pl.'s Suppl. Resp. App. at A190.

Also on April 29, 2011, Open Range Holding and RUS entered into a "Shareholder Agreement."  This agreement provided, among other things, that "[s]ubject to the terms and conditions of the Equity Commitment Letter . . . [OEP Holdings] shall from time to time purchase equity in the Borrower [Open Range] in an amount equal to $40,000,000 in the aggregate, at such times and in such amounts such that the Borrower would always have unrestricted cash and cash equivalents on its consolidated balance sheet sufficient to fund the following six weeks of operating expenses as reasonably determined by the Company."  See 2d. Am. Compl. Ex. D.

After the Loan Amendment, Equity Commitment Letter, and Shareholder Agreement were executed, RUS funded the advances listed in Schedules B-1 and B-2.  It is undisputed that G4S received the $2.7 million identified on Schedule B-1.  However, an audit report prepared by a consultant to Open Range in September 2011 indicates that Open Range had not closed out its contracts with vendors, and that additional amounts were owed to G4S and other vendors at that time.  See Pl.'s Suppl. Resp. App. at A332.

Open Range filed for bankruptcy on October 6, 2011.  See In re Open Range Commc'ns, Inc., Bk. No. 11-13188, 2013 WL 542471, at *1 (Bankr. D. Del. Feb. 12, 2013).  On that date, Open Range held, among other assets, a deposit account with a

balance of $4.9 million.  Id.  The $4.9 million in funds were subsequently moved to an

escrow account.  Velocitel, Inc., another Open Range vendor, filed an adversary

proceeding against the appointed trustee and the United States seeking a declaration

regarding its rights to the escrow account.  The trustee filed an answer and a third party

complaint seeking a declaration that the escrow account was property of the estate.  As a

result, other parties, including G4S, were added as third-party defendants.  G4S, in turn,

filed an answer, counterclaims, and cross-claims against various parties, including RUS.

Although most of the parties reached a settlement resolving most of the disputes, the

settlement did not resolve the causes of action or claims that G4S had asserted against

RUS and the trustee, among others.  The Bankruptcy Court ultimately dismissed G4S's

cross-claims.  Id. at *5.[9]

### g.  Procedural history

Plaintiff filed its initial complaint on January 3, 2012, and an amended complaint

on January 24, 2012.  The Government moved to dismiss on March 5, 2012.  Plaintiff

filed a second amended complaint, which was deemed filed on May 31, 2012.  The

government moved to dismiss the second amended complaint under RCFC 12(b)(1) and

RCFC 12(b)(6) on June 14, 2012.  On October 15, 2012, the court stayed consideration of

the government's motion, and ordered discovery on the limited issue of whether G4S

---

[9] Specifically, the Bankruptcy Court held that G4S had failed to allege facts that plausibly
supported a claim that the pledged deposit account was a "resulting trust" for the benefit of G4S.
See In re Open Range, slip. op. at 5.  Under Delaware law, a resulting trust "arises where a
person conveys property under circumstances that raise an inference that the person does not
intend the person taking or holding the property to have the beneficial interest in the property."
Id. (quoting Official Comm. Of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.,
432 B.R. 135, 148 (Bankr. D. Del. 2010)).

could establish a contractual right to recovery against the United States.  On January 24, 2013, prior to the close of discovery, the government moved for judgment on the pleadings, or, in the alternative, for summary judgment, a stay of discovery, and expedited consideration of motion to stay discovery.  The court denied the government's request for a stay of discovery on February 1, 2013.  The parties completed discovery on or about July 2, 2013.  Supplemental briefing on the government's outstanding motions was completed on September 6, 2013, and oral argument was heard on January 14, 2014.

## II.    DISCUSSION

As noted above, the government has moved to dismiss plaintiff's second amended complaint under Rules 12(b)(1) and 12(b)(6) on the grounds that G4S cannot establish a contractual relationship with the United States and thus this court cannot hear its case. Plaintiff, as also noted above, argues that this court has jurisdiction because it is an intended third-party beneficiary to the Loan Agreement.  As a general rule, the Tucker Act does not provide the court with jurisdiction to hear a claim brought directly against the federal government by a subcontractor.  See  28 U.S.C. § 1491(a) (2012); United States v. Johnson Controls, Inc., 713 F.2d 1541, 1550 (Fed. Cir. 1983).  An exception exists, however, which allows an intended third-party beneficiary of a government contract to enforce its rights directly against the federal government.  See JGB Enters., Inc. v. United States, 497 F.3d 1259, 1261 (Fed. Cir. 2007).

It is well established that when the facts that convey subject-matter jurisdiction are intertwined with those that determine the merits, the court may deny the 12(b)(1) motion and elect to resolve the jurisdictional issues on either a motion for summary judgment or,

after a hearing, on the merits.  See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 203

n.19 (1974); Land v. Dollar, 330 U.S. 731, 739 (1947); Moden v. United States, 404 F.3d

1335, 1340-42 (Fed. Cir. 2005); Spruill v. Merit Sys. Prot. Bd., 978 F.2d 679, 689 (Fed.

Cir. 1992) (nonfrivolous claim within jurisdiction sufficient to withstand motion to

dismiss).  Moreover, when the court considers—and does not exclude—materials outside

of the pleadings, dismissal under RCFC 12(b)(6) or 12(c) is not appropriate.  See Briseno

v. United States, 83 Fed. Cl. 630, 634 (2008).  Rather, such a motion must be converted

into one for summary judgment under RCFC 56(c).  Id.

Here, G4S's contention that it was an intended third-party beneficiary of the Loan

Agreement between RUS and Open Range goes to the heart of both the court's

jurisdiction under the Tucker Act and the merits of plaintiff's claim, rendering resolution

of the dispute under RCFC 12(b)(1) inappropriate.  The court finds that G4S has made a

nonfrivolous claim regarding its potential status as a third-party beneficiary.  Therefore,

the government's motion to dismiss for lack of subject-matter jurisdiction is **DENIED**.

The court will thus proceed to consider the matter on summary judgment.[10]

### a.  Standard of review for Rule 56 motions for summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

RCFC 56(a).  The court's task is to determine whether there exists a genuine issue of

material fact for trial, and not "to weigh the evidence and determine the truth of the

---

[10] Because the court has considered, and not excluded, materials that were not part of the
pleadings, the court also **DENIES** the government's RCFC 12(b)(6) and 12(c) motions.

matter . . . ." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).  As it does for all

Rule 56 motions, the court views the evidence in a light most favorable to the nonmoving

party, drawing reasonable inferences in its favor.  See Schooner Harbor Ventures, Inc. v.

United States, 569 F.3d 1359, 1362 (Fed. Cir. 2009); Galvin v. Eli Lilly & Co., 488 F.3d

1026, 1031 (D.C. Cir. 2007).  If the court finds that a rational trier of fact could not find

for the nonmoving party, then there is no genuine issue for trial and the movant is entitled

to summary judgment.  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting

Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  Whether

G4S was an intended third-party beneficiary under the Loan Agreement between RUS

and Open Range is appropriate for resolution on summary judgment.  See Flexfab, L.L.C.

v. United States, 424 F.3d 1254, 1259, 1265 (Fed. Cir. 2005) (affirming summary

judgment where plaintiff did not present evidence sufficient to raise a genuine question as

to status as intended third-party beneficiary).

### b.  Positions of the parties

Plaintiff contends that the Loan Agreement between RUS and Open Range

demonstrated their intent to directly benefit Open Range's vendors by compensating

them for work performed in constructing the broadband network.  Plaintiff argues that

intent can be inferred from the following facts: (1) the stated purpose of the Loan

Agreement, which was to finance RUS-approved construction, could only be effectuated

by using loan proceeds to pay vendors; (2) Open Range's submission—and RUS's

approval—of build-out plans every six months that unambiguously indicated that third-

party vendors would perform construction work; (3) RUS's review, editing, and approval

of the MSA between Open Range and G4S; (4) RUS's review of vendor invoices as part of the loan advance process; (5) RUS's requirement that Open Range establish a pledged deposit account from which funds could only be withdrawn as agreed to by RUS; (6) RUS's and Open Range's communication about the vendors' progress and concerns in constructing the broadband network, including that some vendors had threatened to stop work if they were not paid; (7) Schedules B-1 and B-2 of the Equity Commitment Letter, which obligated RUS to advance specific funds to pay for specific vendor work performed under specific vendor contracts; and (8) RUS's audits of the deposit account to ensure that loan funds were disbursed according to RUS's intent and the terms of the contract.

In response, the government argues that these facts are not sufficient to show that RUS intended to confer a benefit directly on G4S, such that G4S is entitled to sue the United States for payment. According to the government, the only "intended beneficiaries" of the Loan Agreement were the residents of the rural communities within RUS-approved markets. Because RUS never committed to pay—and never in fact paid—any of Open Range's vendors directly, the government views G4S as only an "incidental beneficiary" of the Loan Agreement. The government asserts that G4S's status as an incidental beneficiary is unaffected by RUS's review of vendor progress reports and payment requests or its knowledge that Open Range would use the loan advances in order to pay its vendors.

### c.  The legal standard for third-party beneficiary status

Traditionally, a third party could not sue on a contract to which it was not a party. See 13 Williston on Contracts § 37:1 (4th ed. 2013).  Over time, however, courts began to recognize a limited exception in instances "when a promisor agrees with a promisee to render a performance to a third party instead of to the promisee . . . ." Id.; see also Restatement (Second) of Contracts § 302 (1981).[11]  Nevertheless, it remains the general rule that a subcontractor that agrees to supply materials or labor to a general contractor is only an incidental beneficiary of any contract between the general contractor and its ultimate client.  See 9 Corbin on Contracts § 45.3 (rev. ed. 2007); Restatement (Second) of Contracts § 302 cmt. e., illus. 19; accord BIS Computer Solutions, Inc. v. City of Richmond, 122 F. App'x 608, 610, 612 (4th Cir. 2005) (finding subcontractor was not an intended third-party beneficiary under Virginia law despite being named in prime contract and contract provision prohibiting subcontractor's removal without the government's approval).  Thus, this narrow exception applies only when the contracting

---

[11] Section 302 provides as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302.

parties demonstrate their intent to confer a direct benefit on a third party.  See

Restatement (Second) of Contracts §§ 302, 304.  For example:

> B promises A to pay whatever debts A may incur in a certain undertaking.
> A incurs in the undertaking debts to C, D and E.  If the promise is
> interpreted as a promise that B will pay C, D and E, they are intended
> beneficiaries . . . [but] if the money is to be paid to A in order that he may
> be provided with money to pay C, D and E, they are at most incidental
> beneficiaries.

Id. § 302, cmt. b, illus. 3.[12]

In applying these general principles, the court's task is to distinguish between

prime contracts that create "intended beneficiaries," which establish a duty in the

government to the third-party vendor, and contracts that merely create "incidental

beneficiaries," which do not establish any such obligation.  See Restatement (Second) of

Contracts § 304.  In conducting this analysis, the court looks first to the language of the

prime contract, and then to other objective evidence.  See Flexfab, 424 F.3d at 1262.

Although the express naming of a third party "greatly facilitates a determination that the

promisor and promisee intended to confer enforceable rights on the named party," 9

Corbin on Contracts § 44.8, the prime contract's express identification of a subcontractor

is neither necessary nor sufficient to demonstrate the requisite intent, see Flexfab, 424

F.3d at 1260; 9 Corbin on Contracts § 44.8; Restatement (Second) of Contracts § 308

---

[12] Comment e, Illustration 19, similarly states, "A contracts to erect a building for C.  B then
contracts with A to supply lumber needed for the building.  C is an incidental beneficiary of B's
promise, and B is an incidental beneficiary of C's promise to pay A for the building."
Restatement (Second) of Contracts § 302 cmt. e., illus. 19.

cmt. a; see also Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997)

(plaintiff must "fall within a class clearly intended to be benefited thereby").

Where a subcontractor seeks recognition as an intended beneficiary of a federal

contract, it is possible to infer the requisite intent on the part of the government "from the

actions of the contracting officer and circumstances providing the contracting officer with

appropriate notice that the contract provision at issue was intended to benefit the third

party." Flexfab, 424 F.3d at 1262. Notwithstanding this theoretical possibility, it is

extremely difficult to establish status as an intended third-party beneficiary by inference

in the context of a government contract. See, e.g., id. at 1263-65 (declining to infer

contracting officer's knowledge or intent based on actions of other contracting

personnel); US Ecology, Inc. v. United States, 245 F.3d 1352, 1356 (Fed. Cir. 2001)

(holding government's cooperation with third-party insufficient to establish third-party

beneficiary status); O. Ahlborg & Sons, Inc. v. United States, 74 Fed. Cl. 178, 189-90

(2006) (holding government's involvement in negotiating subcontracts and program

oversight insufficient to establish contractual privity with subcontractor); JGB Enters.,

Inc. v. United States, 63 Fed. Cl. 319, 334 (2004) (declining to infer contracting officer's

knowledge or intent based on actions of other contracting personnel). Indeed, because

waivers of sovereign immunity are construed narrowly, the right to sue the government

on a contract to which one is not a party constitutes an "exceptional privilege." Glass v.

United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German Alliance Ins. Co. v.

Home Water Supply Co., 226 U.S. 220, 230 (1912)). The standards to be applied in this

circuit for determining whether a subcontractor can claim status as an intended third-

party beneficiary are laid out in the following cases: <u>D & H Distrib. Co. v. United States</u>, 102 F.3d 542 (Fed. Cir. 1996) ; <u>Flexfab</u>, 424 F.3d 1254; and <u>JGB</u>, 63 Fed. Cl. 319, <u>aff'd</u>, 497 F.3d 1259 (Fed. Cir. 2007).

In <u>D & H</u>, a prime contractor ("CIM") failed to pay the plaintiff ("D & H"), its subcontractor, for materials plaintiff had furnished to the National Security Agency ("NSA") on CIM's behalf.  <u>See</u> <u>D & H</u>, 102 F.3d at 544.  Although initially reluctant to subcontract to CIM, D & H agreed after the NSA amended the prime contract to assign payment to CIM and D & H jointly.  Notwithstanding this modification, after D & H rendered performance the NSA issued a check in CIM's name only.  CIM later became insolvent, having failed to fully compensate D & H.  The Federal Circuit concluded that D & H enjoyed the status of a third-party beneficiary.  The circuit explained:

> The entire purpose of the <u>joint payment clause</u> was to provide protection for D & H by giving it a right to control the disbursement of the contract proceeds and thereby to ensure that its invoice to CIM would be paid.  The rights conferred on D & H were designed to effectuate the payment of CIM's debt to D & H, which would arise upon CIM's execution of the contract.

<u>D & H</u>, 102 F.3d at 547 (emphasis added).  Thus, the court adopted a rule that a subcontractor is entitled to enforce a contract where the subcontractor is made a joint-payee of the prime contract.  <u>Id.</u>

In <u>Flexfab</u>, the Federal Circuit again addressed the right of a subcontractor to sue the federal government directly after a prime contractor failed to pay the subcontractor. In that case, the Defense Logistics Agency, Defense Supply Center Columbus ("DSCC") awarded a contract to Capital City to supply various materials to the Defense Department.

Flexfab, 424 F.3d at 1257.  Despite initial reluctance, Flexfab eventually agreed to

subcontract to Capital City after various DSCC officials promised to amend the prime

contract to provide for direct payment to Flexfab's escrow account.  Id.  Notwithstanding

this agreement, payment was rendered to Capital City, which subsequently became

insolvent without having satisfied its debts Flexfab.  Id. at 1258.  Flexfab brought suit

against the federal government alleging, inter alia, that Flexfab was an intended third-

party beneficiary of the contract amendment.

      The Federal Circuit concluded that Flexfab had failed to show that the relevant

DSCC contracting officer intended to convey a benefit on Flexfab, and thus denied

recovery.  Id. at 1262-63 ("Though . . . the modification of a remittance clause to give a

subcontractor control over payments from the government qualifies the subcontractor as

an intended third-party beneficiary, that rule of law is subject to the principle that only

those with authority to contract on the government's behalf can exhibit the necessary

intent to give the subcontractor such control.").  The court thus made clear that the

government's ratification of a contract provision that expressly provides for direct

payment to a subcontractor remains unenforceable by the subcontractor, absent evidence

of such intent of an authorized government official.  See id.

      JGB involved non-payment by the same prime contractor in Flexfab, but a

different subcontractor ("JGB").  JGB, 63 Fed. Cl. 319 (2004).  Unlike the plaintiff in

Flexfab, however, JGB directly contacted the DSCC contracting officer in order to obtain

assistance concerning Capital City's arrearages.  Id. at 323.  Following a series of

communications between JGB and DSCC officials, JGB threatened to cease performance

unless the situation was addressed.  The DSCC contracting officer subsequently

threatened Capital City with debarment if the situation was not resolved.  Id. at 324.

Ultimately, the DSCC contracting officer agreed to amend the prime contract to allow for

direct payment to an escrow account designated by the prime contractor, which in

actuality was JGB's bank.  See JGB, 497 F.3d at 1260.  Notwithstanding this agreement,

the government mailed payment to Capital City.  JGB, 63 Fed. Cl. at 329.  Moreover, the

payment reflected a deduction due to monies owed by Capital City on an unrelated

contract with the government.  Id.  Capital City became insolvent without having

satisfied its debt to JGB.  Despite the fact that JGB was not listed by name as a joint-

payee, the court concluded that because the DSCC contracting officer understood that the

purpose of amending the payment procedure was to set aside monies for JGB, JGB

became an intended third-party beneficiary of Capital City's contract with the

government.  Id. at 334.

### d.  Tested by the aforementioned standards, plaintiff cannot show that G4S was an intended third-party beneficiary

The court gleans from these cases that in order for a subcontractor to obtain the

status of an intended third-party beneficiary, it must provide clear evidence that an

authorized government official approved a contract provision for the express purpose of

effectuating payment from the government to the subcontractor(s).  This showing can be

satisfied by the unambiguous language of the prime contract and any modifications made

thereto, and by other objective evidence that clearly demonstrates the authorized

official's unambiguous intent to ensure payment to the subcontractor(s).  The court will

not, however, infer that the government intended to directly benefit the subcontractor merely because an authorized government official (1) oversees the activities of the prime contractor; (2) becomes aware that the prime contractor has failed to timely pay its subcontractors, and/or (3) makes funds available to the prime contractor in order for the prime contractor to pay its subcontractors.  Applied to this case, plaintiff has failed to identify any evidence—much less clear evidence—that Mr. Kuchno or Mr. Adelstein approved a contract provision for the express purpose of ensuring that a portion of the loan advances would go directly to Open Range's vendors, including G4S.[13]

To begin, nothing in the plain language of the Loan Agreement indicates that RUS intended to assume any obligation to ensure that Open Range's vendors received, directly or jointly with Open Range, any payment from RUS.  Rather, the Loan Agreement explains how, and for what purpose, RUS would disburse funds to Open Range's deposit account.  Similarly, plaintiff has not identified any provision of the Loan Amendment, Equity Commitment Letter (including Schedule B-1), or Shareholder Agreement in which RUS unambiguously agreed to modify the loan advance process for the express purpose of effectuating payment directly to Open Range's vendors.  Notably, none of these agreements gave Open Range's vendors control over the pledged deposit account,

---

[13] The court notes that the RUS Administrator was authorized to approve loans in excess of $25,000,000, and RUS "Area Directors" were authorized to approve smaller loans and modifications in the methods of carrying out loan purposes.  See 7 C.F.R §§ 1700.55(a)-(c) (2010).  Plaintiff has not identified—and the court is unaware of—any RUS officials other than Mr. Adelstein and Mr. Kuchno whose intent to benefit Open Range's vendors would be relevant to resolving the government's Motion for Summary Judgment.  See Flexfab, 424 F.3d at 1262 ("only those with authority to contract on the government's behalf can exhibit the necessary intent" to benefit a third party to establish third-party beneficiary rights).

required RUS to advance any portion of the loan proceeds directly to any of Open

Range's vendors, or required RUS to advance a portion of the loan proceeds to an

escrow-account controlled by any of Open Range's vendors.  At most, these agreements

provided RUS with additional notice of Open Range's outstanding obligations to its

vendors.

Even granting plaintiff the inference that authorized RUS officials were concerned

that Open Range's vendors might stop working if arrearages weren't addressed, the

record is devoid of evidence that an authorized RUS official intended to do anything but

pay Open Range so that Open Range had sufficient funds to carry out its plan of

constructing a rural broadband network.  RUS's close oversight of Open Range,

awareness of Open Range's arrearages, and willingness to advance loan funds to Open

Range, taken individually or in combination, are insufficient to demonstrate that RUS

approved the Loan Amendment for the express purpose of directly or jointly paying Open

Range's vendors.  In this connection, plaintiff's contention that G4S is similarly situated

to the plaintiff in JGB rings hollow.  Unlike Mr. Adelstein and Mr. Kuchno, the

contracting officer in JGB took specific actions to modify the prime contract's payment

mechanism for the express purpose of ensuring that JGB received payment from the

government.[14]  See JGB, 497 F.3d at 1260-61.  Thus, in contrast to JGB, G4S fits

squarely within the category of indirect beneficiaries identified in Restatement (Second)

---

[14] Although the other case plaintiff relies on, FloorPro, Inc. v. United States, 98 Fed. Cl. 144,
145-46 (2011) can be similarly distinguished, that decision was subsequently vacated by the
Federal Circuit, 680 F.3d 1377 (Fed. Cir. 2012).

of Contracts § 302, cmt. b., illus. 3 (if money is paid to the prime contractor in order to ensure the prime contractor has money to pay subcontractors, the subcontractors are at most incidental beneficiaries).  As such, plaintiff has failed to establish that G4S was an intended third-party beneficiary of the agreements between RUS and Open Range.[15]

For the court to hold otherwise would transform the "exceptional privilege" of status as an intended third-party beneficiary into a broad right of subcontractors to sue the federal government in any case where the contracting officer closely oversees the prime contractor's work with its subcontractors, or whenever an agency pays a prime contractor with the knowledge that some of that payment would be used to compensate subcontractors.  Such an expansion of an otherwise narrow exception to the requirement that a plaintiff be in privity with the government would undermine the traditional relationship between contracting officers and prime contractors, as well as between prime contractors and their subcontractors.  Therefore, without clear evidence that an authorized

---

[15] The court notes that plaintiff previously indicated that it intended to request additional discovery pursuant to RCFC 56(d)(2).  See Pl.'s Opp. to Def.'s Mot. for Stay of Disc. at 6, ECF No. 37 ("G4S plans to request further discovery pursuant to RCFC 56(d)(2) on issues such as the RUS's involvement in negotiating the language of the form Master Services Agreement, including a deposition of Scott Steiner.").  Plaintiff has not filed an affidavit or declaration explaining with precision how additional discovery would aid its response to the government's motion for summary judgment.  Because such an affidavit or declaration is required for a party to avail itself of the shelter provided by RCFC 56(d), the court **DENIES** plaintiff's request to postpone ruling on the government's summary judgment motion to allow for additional discovery.  See Carolina Power & Light Co. v. United States, 48 Fed. Cl. 35, 41 (2000) (citing cases).  Moreover, because the court has already assumed the facts that G4S asserts (i.e., that RUS helped draft the MSA, supervised construction, and knew that payments to Open Range would be used to reimburse vendors), additional discovery to confirm those facts is unwarranted.  Id.  The government's close oversight of the prime contractor—including oversight of the prime's relationships with its subcontractors—is simply insufficient confer status as an intended third-party beneficiary on a subcontractor.

government official approved a contract provision for the express purpose of effectuating payment from the government to the vendor, subcontractors remain merely incidental beneficiaries.  Because G4S has failed to make this showing, the court is compelled to **GRANT** the government's motion for summary judgment.[16]

## III.   CONCLUSION

Based on the foregoing discussion, the court concludes that G4S has failed to establish a genuine dispute as to whether G4S was a third-party beneficiary of the Loan Agreement between RUS and Open Range.  Therefore, the Government's Motion for Summary Judgment is **GRANTED**.  The clerk is directed to enter judgment accordingly. Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[16] Because the court concludes that plaintiff has not raised a genuine dispute as to G4S's status as a third-party beneficiary, the court does not reach the government's alternative defenses.